CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF DELAWARE

2                  C.A. No. 20-425 MAK

3    KNOWLEDGELAKE, INC.,

4                    Plaintiff,

5     v.

6    PFU AMERICA, INC.,

7                    Defendant.

8    _____/

9

10                        Remote Deposition

                         June 21, 2021

11                       11:00 a.m. - 1:35 p.m.

12

13            DEPOSITION OF RON CAMERON

14                   (Confidential)

15

16      Taken before SUZANNE VITALE, R.P.R., F.P.R.

17   and Notary Public for the State of Florida at Large,

18   pursuant to Notice of Taking Deposition filed in the

19   above cause.

20

21

22

23

24

25

CONFIDENTIAL

Page 2

```
 1    APPEARANCES:

 2

 3    On behalf of Plaintiff:

 4    SWIECICKI & MUSKETT, LLC
      16100 Chesterfield Parkway West
 5    Suite 368
      Chesterfield, Missouri 63017
 6    BY:  CHRIS SWIECICKI, ESQ.

 7

 8    On behalf of Defendant:

 9    MCGUIRE WOODS, LLP
      Two Embarcadero Center
10    Suite 1300
      San Francisco, California 94111
11    BY:  ALICIA BAIARDO, ESQ.
              abaiardo@mcguirewoods.com

12

13    and

14    ANDREW HODGES, ESQ. (PFU)

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 36

1    Q.    When you say "they," are you referring to

2    PFU?

3    A.    The PFU executives, yes.

4    Q.    Do you know why they killed the deal?

5    A.    They mentioned to me at that time that

6    Rubicon had required them to ask PFU's parent

7    company, Fujitsu, for a global non-competition

8    agreement for capture software, which would be a

9    ridiculous ask of a $50 billion-plus company.  And

10   there were other issues that I really don't know of,

11   but apparently there was sort of a laundry list of

12   outstanding deal issues that couldn't be overcome

13   which finally just broke the deal.

14   Q.    When did you decide to -- or when did you

15   start thinking about purchasing KnowledgeLake?

16   A.    Well, they jokingly mentioned it that

17   evening, maybe you should just --

18   Q.    In Tokyo?

19   A.    In Tokyo.  I sort of dismissed it and was

20   not at all -- had not even had that thought cross my

21   mind.

22         But in my -- there was a comment that was

23   made by Kiyoshi Hasegawa at that dinner that night

24   which got me thinking.  He said, Ron, the only thing

25   we really need is we need to sell KnowledgeLake, and

CONFIDENTIAL

Page 37

1    we really don't care about the price as much as we

2    care about the risk.

3              And it's very Japanese culture.  The

4    Japanese are very risk-adverse people.  They don't

5    like taking business risk.  They're very calculated,

6    and they felt very uncertain in how to sort of

7    dispose of KnowledgeLake without winding up in a ton

8    of litigation after the thing was over.

9              So he said -- the thing that stuck with me

10   was -- and, again, paraphrasing, we don't care about

11   the purchase price as much as we care about making a

12   transaction with very little risk.

13        Q.   And do you recall who was at the dinner?

14   You said "they," and I think you mentioned maybe one

15   or two names.

16        A.   I was invited there by Kiyoshi Hasegawa.

17   And who was actually at that dinner?

18        Q.   Who do you recall speaking with on these

19   points?  Kiyoshi Hasegawa, that was the main person?

20        A.   That was the main person, yes.

21             I do recall, however, that Kenji Tsurumi,

22   who I'm sure you're aware of that name, right, Kenji

23   Tsurumi?  I do believe he was at that dinner that

24   night.  I'm not speculating with that.  I do recall

25   him being at that dinner because I remember

CONFIDENTIAL

Page 39

1    helpful any way I could to try to make sure that it

2    happened because I felt like it was a good thing for

3    the people.

4         Q.    Okay.   You mentioned PFU being risk

5    adverse and wanting to avoid litigation.

6              What made you say that?

7         A.    Several examples along the way of PFU --

8    PFU being very, very scared of being a defendant in

9    litigation, okay, and never, ever, at any time that

10   I knew them for however long it would have been,

11   over ten years, never, ever being a plaintiff.

12             So they just wanted to stay away from any

13   legal risk sort of at all costs.   One example I can

14   cite is they had -- they had sort of required me to

15   use KnowledgeLake funds -- and, again, timing, 2013,

16   right after the acquisition, they wanted to invest

17   $3 million into a company in Seattle called Blue

18   Rooster, and I knew the CEO well.

19             I emphatically advised them to absolutely

20   not do the transaction because I didn't have any

21   belief in the deal.   I didn't have any belief in the

22   person that they were investing in, the CEO of the

23   company.

24             And the CEO of the company very quickly,

25   the money -- the money, it just disappeared.   Just

CONFIDENTIAL

Page 40

1   poof, just gone.  $3 million gone.  It just dried up

2   and blew away.  Literally, at the second board

3   meeting, all the money was gone, and nobody could

4   tell where it went.

5           And I told PFU, you should absolutely get

6   a lawyer and go figure this out because the guy just

7   stole your money.  And I was told that we were not

8   going to engage lawyers.  We were going to do

9   everything we could to avoid the risk of litigation

10  because what if this guy decided to sue them?

11          So we actually avoided any kind of

12  litigation by making sure that we basically gave the

13  shares that we purchased back to the person -- the

14  person's company we had invested in.

15          It was a very, very odd situation that no

16  American person would have ever done.  So it's an

17  example of just being completely risk adverse in

18  every way in regard to litigation.

19      Q.   And when was that?  Did you say it was

20  after you had acquired KnowledgeLake?

21      A.   It was after.

22      Q.   It was after you acquired KnowledgeLake?

23      A.   It was later in 2013.

24      Q.   Got it.  After PFU had acquired

25  KnowledgeLake?

CONFIDENTIAL

Page 41

1        A.    Right.   And they had forced my hand.   Even

2   passed my advice to them to not make the investment.

3   They required me to do it anyway.   It was their

4   money.   So we made the investment.   I signed all the

5   papers, because they required me to, and then it all

6   went bad.

7            Anyway, but any normal -- any normal

8   businessperson in the U.S. would have absolutely

9   sued that person, and they just desperately wanted

10  to get away from it any way they could.   It's just

11  an example.

12       Q.   You mentioned to me that you started

13  KnowledgeLake, and we've been through the history

14  and kind of how you ended up back with

15  KnowledgeLake.

16            Have you been involved with any other

17  companies in ownership roles?

18       A.   I am currently an owner at -- a very small

19  percentage owner at a company called SkySync that I

20  mentioned.   And no, no, that's it.

21            Again, I'm trying to make sure that I

22  don't tell you anything wrong.   But no, I don't

23  currently have any other positions other than

24  SkySync and KnowledgeLake.   That's it.

25       Q.   Have you been involved in any other

CONFIDENTIAL

Page 51

1   conversion at some point.

2         To the best my recollection, I think it

3   was after that second investment in 2010.

4       Q.   So the Japanese-based fiscal year is

5   ending March 31st?

6       A.   Yes.

7       Q.   And in your experience, was that a big

8   event, the end of the fiscal year?

9       A.   Yes, I think it's a significant event.

10      Q.   Okay.  And can you walk me through, you

11  know, what would typically happen at the end of the

12  fiscal year in terms of accounting and invoices and

13  things that were unpaid?

14      A.   It was pretty -- pretty -- the Japanese

15  are pretty demanding with their accounting process.

16  So the end of the fiscal year really wasn't any

17  different than the end of any calendar year, but it

18  was a lot of pressure on our accounting staff

19  because we had to report -- we had to report numbers

20  to them in the second day of -- the second business

21  day of the next month, we had to be closed and give

22  our numbers to PFU corporate.  And that wasn't just

23  at the end of the fiscal year.  That was at the end

24  of every month.

25      Q.   So each month, would you say there was

1   be?

2         A.    Probably, it would drop down to -- again,

3   we had other large deals that sort of came and went.

4   We'd do a large project for a company, like, you

5   know, Bank of America or whoever, but it would

6   always be kind of -- it would be a big project for

7   that one year, and then it would sort of diminish to

8   a lower number.

9               Walmart was always a very consistent large

10  company from a total, total annual value, so it's

11  much different.

12              So when you look at our -- sort of our

13  next biggest account, it would have been something

14  we sold in one particular year that would be a big

15  sale, and it would sort of go away.

16              Then, yeah, so, say, number two would be

17  hard because it would have been based on what year

18  would you pick.  But by far and away, Walmart would

19  always be number one.

20        Q.    Okay.  So the last year you were with

21  KnowledgeLake, 2017, do you recall if there was any

22  other big accounts that year?

23        A.    I'm sorry.  I don't recall.

24        Q.    So when you were deciding to purchase old

25  KnowledgeLake, were you aware of that Walmart

CONFIDENTIAL

Page 62

1    invoice and when it typically would have been paid?

2         A.   I was always keenly aware of Walmart's

3    position because they were absolutely one of the big

4    assets I was buying.

5              Most importantly, I had represented that

6    to my money partner, Plymouth Growth Partners, that

7    Walmart had given KnowledgeLake over 30 million in

8    total revenue since 2007, and it was an instrumental

9    component in me actually getting the money to

10   actually do the transaction.

11             So yes, I had my -- it was very much had

12   the spotlight on it from my perspective.

13        Q.   And when you say it was a critical

14   component to getting the money to do the

15   transaction, was it the 2018 invoice or was it the

16   Walmart ongoing relationship?

17        A.   It was both.  You know, Walmart had a

18   whole history of always being -- annually being very

19   good for, you know, minimum of 2 and sort of a

20   maximum of 5 million in annual revenue.  So it was a

21   big component of the sale that I was able to make to

22   get the money to do the deal.

23             In addition, the money that was sitting on

24   the AR for that million was also -- because I knew

25   that there's no way that would be paid by the end of

CONFIDENTIAL

Page 68

1        Q.    Do you think they were paying 872- on this

2    invoice and then whatever the differential was on

3    the others?

4        A.    I don't know that.  I don't know.

5        Q.    We talked about you had left KnowledgeLake

6    December 31, 2017; is that right?

7        A.    That's right.

8        Q.    So this invoice is dated February 2018 to

9    Walmart.  This is the invoice we were just talking

10   about.  It says "Terms, net 30 days."

11            Can you explain to me what that means?

12       A.    That's what it means, is what it means.

13   It's due within 30 days from February 15th.

14       Q.    So that means Walmart needed to pay this

15   by March 15, 2018?

16       A.    That's what the document says.

17       Q.    Okay.  So would it have been overdue as of

18   March 16, 2018?

19       A.    It would have been.

20       Q.    At the time, you were not with Walmart --

21   sorry, Walmart -- not with KnowledgeLake.

22            MS. BAIARDO:  And there's this e-mail

23       chain, I'm going to introduce as -- did I

24       introduce Exhibit B -- this invoice as

25       Exhibit 2 to the deposition, please, Madam

CONFIDENTIAL

Page 70

```
 1        A.     I believe she was a direct report to Robin
 2   Heisler.
 3        Q.     Do you know who Chrisha Cooper is?
 4        A.     Also another employee of our accounting
 5   department.
 6        Q.     It looks like Robin sends this from a
 7   KnowledgeLake e-mail address to what appears to be a
 8   personal e-mail address robin.heisler@outlook.com.
 9              Do you know if that is her personal e-mail
10   address?
11        A.     I have no knowledge of that.  I don't
12   know.
13        Q.     And then it looks like she sends it to
14   you.
15              Is this your personal e-mail address
16   ronlcameron@yahoo.com?
17        A.     That is my personal e-mail address, yes.
18        Q.     It says, "FYI."
19              Do you remember Robin sending you this
20   e-mail?
21        A.     I do.
22        Q.     Can you tell me about that?
23        A.     Robin was very concerned that we had --
24   she called me on the phone and sent me the e-mail
25   and said, hey, Bernie's got Gary Wahlig doing
```

1    collections.

2         And to kind of give you the background

3    there, Gary is -- Gary works on our services team

4    and Gary actually manages the accounts payable

5    system at Walmart.  That's the main function of

6    KnowledgeLake, is to manage payables for Walmart.

7    And asked Gary to actually look into their system to

8    find out the status, I suppose, of the KnowledgeLake

9    payment and, you know, if we can expedite it, I

10   suppose.

11        Q.   And what was the basis of Robin's

12   knowledge of this?

13        A.   I guess this e-mail thread.  I don't know.

14   How did she get that?  Did Gary copy her?  I'm not

15   really sure.

16        Q.   Well, there's a little more color to your

17   response than what's in the e-mail.

18        A.   So it looks like Gary copied Dot and maybe

19   Dot copied Robin on it.

20        Q.   Dot forwarded it to Robin?

21        A.   Right.  There you go.  That's how Robin

22   found out, was from Dot.

23        Q.   So why is Robin calling you?

24        A.   Because Robin is not only on the PFU team,

25   but she's on my team because she's concerned about

CONFIDENTIAL

Page 72

1    our -- you know, having a fair deal.

2          Q.    But at this point, she works for

3    KnowledgeLake?

4          A.    That's not totally accurate because we

5    agreed with PFU that Robin would be a hybrid

6    employee.   She'd be representing KnowledgeLake as

7    old KL and new KL.

8          Q.    But why is she sending it to her personal

9    e-mail address?

10          A.    You'd have to ask Robin that.   I don't

11    know.

12          Q.    Does that suggest that she didn't think

13    people at KnowledgeLake would be happy with her

14    sending this to you?

15          A.    It doesn't suggest anything to me because

16    if she was worried about that, why wouldn't she

17    just -- she went ahead and sent it to me.   So why

18    would she send it to herself and then send it

19    directly to me if she was worried about something?

20    I don't know.

21          Q.    Well, that's my question exactly.

22          A.    What's the question?

23          Q.    The question is, why do you think she sent

24    this to her personal e-mail address and then sent it

25    to your personal e-mail address?

CONFIDENTIAL

Page 73

1        A.    I don't know.  You should ask Robin.

2        Q.    I did ask Robin.

3        A.    Well, if she was trying to hide something,

4    is my point, she wouldn't send it to me.  She would

5    have sent it to herself and then to me.

6        Q.    That's what she did.  She sent it to

7    herself and then to you.

8        A.    She sent it to herself and then to me?

9        Q.    She sent it from herself at KnowledgeLake

10   to herself at Outlook to you.

11       A.    I don't know.  That's a great question.

12       Q.    Okay.

13       A.    There was nothing to be -- there was

14   nothing to hide on Robin's part.  Maybe she was

15   worried about that.  I don't really know, but it

16   was -- it was agreed that it was -- this was an

17   amicable deal, and Robin was going to be the one

18   person that was going to be the center point in that

19   she was going to represent old KnowledgeLake and new

20   KnowledgeLake, and we were going to use her as sort

21   of a go-between in getting the deal finished.

22       Q.    Okay.  Was she motivated to have the

23   Walmart invoice paid after the sale?

24       A.    I think she was motivated the same as me,

25   to have a fair deal.

CONFIDENTIAL

Page 75

1          In 2018, you weren't working there

2    anymore.  In 2016 to 2017, you were just fielding

3    calls from Bernie about anything he needed help

4    with.

5          So my question is, what is the basis for

6    your conclusion that it would be odd for Gary to do

7    this?

8      A.   History.  Historically, I've never asked a

9    single services person to collect an invoice like

10   this.

11     Q.   But you stopped serving as president in

12   third quarter of 2016?

13     A.   You asked me for my basis.  It would have

14   been historical from the beginning of January 2001

15   all the way until I stopped running the company in

16   2016.

17     Q.   Okay.  Did you know that the Walmart

18   invoice was paid before the closing?

19     A.   I found out that it was paid on the

20   morning of the 26th of March.

21     Q.   Who told you that?

22     A.   I believe Robin Heisler.

23     Q.   Did she call you?

24     A.   My recollection is she called me, yes.

25     Q.   And what did she say?

CONFIDENTIAL

Page 76

1      A.    She said Walmart paid.

2      Q.    Was she upset?

3      A.    I think she was factual, wanting to let me

4  know.

5      Q.    Did that change anything in your

6  negotiations with PFU, the fact that the invoice had

7  been paid on March 26th?

8      A.    I was sort of resolute at that point to

9  the fact that we'd be right here right now, so -- I

10  had so much on my plate, trying to get money from

11  Plymouth and money from First Bank, trying to get

12  the deal docs done and damage was already complete

13  at that point, so it was like just put it away and

14  move on, and I can deal with it on another day.

15      At that point, after the money had been

16  received, I knew I was going to court, so that was

17  sort of it.

18      Q.    So in your mind, you had already planned

19  to sue PFU before the close?

20      A.    I knew that it would have been brought up

21  on a later date.  I hoped that they would be fair

22  people.  But after several appeals to them later,

23  after we got the deal all documented and done, it

24  was clear that they were not going to be reasonable.

25      Q.    It's interesting to me that you say that

CONFIDENTIAL

Page 77

1    they would be fair people.

2              Do you recall negotiating with Tsurumi

3    directly about when the Walmart invoice would be

4    paid?

5         A.   I do remember that, yes.

6              (Thereupon, the referred-to document was

7    marked for Identification as Defendant's Exhibit 4.)

8    BY MS. BAIARDO:

9         Q.   And for Exhibit 4, I have an e-mail that

10   starts at PFU2779.  It's an e-mail from -- the

11   bottom of the chain begins with Tsurumi to Ron,

12   dated March 21, 2018.

13             "Hi, Ron.  It just came to my attention

14   that one of KL invoices to Walmart dated 2/15/18 is

15   not yet paid as of today (see attached).  The amount

16   of this invoice is approximately $1 million.

17             "Please note that our commitment to leave

18   $3 million cash with KL at the closing date is

19   contingent upon the receipt of a payment for this

20   invoice.  We are hoping that KL will be receiving

21   the payment within next ten days.  But if KL

22   doesn't, we will need to ask you for a credit of the

23   invoice's amount from previously agreed 3 million.

24   With your permission, we would like to change

25   wordings on the stock purchase agreement,

CONFIDENTIAL

Page 81

1    for the clarification on the 3/31-dated check to be

2    cashed on 4/2 for 2.04 million.  We are in

3    agreement.  I'll sign the agreement this afternoon."

4          So does this refresh your memory about the

5    negotiations that were going on surrounding when the

6    Walmart invoice would land?

7       A.   I'm very familiar with that conversation,

8    yes.

9       Q.   So is it fair to say you were negotiating

10   around when the Walmart invoice would be paid?

11      A.   It's fair to say that we -- if you would

12   scroll back up there.

13      Q.   Sure.  Where do you want me to go?

14      A.   Keep going.  Where I referenced Bernie.

15   Right there.

16         "I've been in Bernie's office this

17   morning."  There's a whole other e-mail thread which

18   happened on the 21st, which was all of the stuff

19   kind of coming to light that Bernie is taking some

20   extraordinary actions to try to collect money that

21   normally would not be flowing into the company.

22         So I sent a flurry of e-mails on the 21st.

23   On the morning of the 22nd, I was immediately in

24   Bernie's office saying, Bernie, you're going to blow

25   this up.  We're going to be in a lawsuit.  You've

CONFIDENTIAL

Page 82

1   got to shut this down.

2          Bernie was like, well, you know, I've got

3   to do my job, and I've got to represent PFU and

4   they've asked me to do this and blah, blah, blah.

5          I'm, like, Bernie, you've got to operate

6   KnowledgeLake in its normal and ordinary course of

7   business, or you're going to cause a lawsuit.  And

8   he's, like, well, okay, I get it, I get it.

9          The problem was, the damage was already

10  done, so -- anyway, but the reason I say we're okay

11  to move forward was that I had assumed that, after

12  my discussion with Bernie, is that he would stop.

13         The problem was that it didn't even

14  matter.  It was already done.

15     Q.   So is it fair to say, when you were

16  negotiating this deal with Tsurumi, you're expecting

17  that the $1 million is going to come after to the

18  new KnowledgeLake, after the close?

19     A.   I'm expecting PFU to honor the terms of

20  the deal, which is that KnowledgeLake operates in

21  its normal and ordinary course of business, and that

22  is the exact thing that we're arguing about right

23  now, is that they accelerated the payments through

24  Bernie's actions.  Bernie even told me he was doing

25  it.

CONFIDENTIAL

Page 83

1          So it's a very, very unfortunate set of

2     circumstances that could have been avoided, had he

3     not tampered with the deal.

4          Q.   Well, that's what I find interesting, is

5     because you read this e-mail chain between you and

6     Tsurumi, and you're having a very specific

7     discussion about Bernie -- you know, PFU, through

8     Bernie, trying to get the Walmart invoice paid

9     before the close and you're negotiating around it.

10         A.   But I never excused them.  I never gave

11    them permission.  We never changed the words of the

12    deal to say, hey, this is a free-for-all, collect

13    all you can.  No, that's not the spirit --

14         Q.   So in your mind, does normal --

15         A.   -- of the deal.

16         Q.   Let me finish my question.

17              In your mind, does normal course of

18    business mean that the invoice would not have been

19    paid before March 31, 2018?

20         A.   Yes, correct.

21         Q.   And what's the basis for that?

22         A.   Based on how Walmart had paid us

23    previously and based on the fact that -- I mean, he

24    put pressure -- paid on the 26th.  There's no way

25    that would have been paid on the 26th before.

CONFIDENTIAL

Page 84

1      Q.    But we talked earlier about the invoice

2    was due as of March 16th, and it was paid after it

3    was due; is that correct?

4          A.    That's correct.

5      Q.    And we walked through the prior invoices

6    that Robin had pulled for Kevin in October of 2018,

7    and those were largely paid in March of each year.

8          A.    They were billed in January.  They were

9    billed in January, not February.

10         Q.    So why wasn't this invoice billed in

11   January?

12         A.    Like I said, I don't know that.  I have no

13   idea.  I wasn't operating the company.

14         Q.    So if you weren't operating the company in

15   January of 2018, you have no idea why the invoice

16   didn't go out in January 2018, why are you so sure

17   about when the invoice should have been paid in

18   March of 2018?

19         A.    Why am I so sure?  State that again.  I'm

20   getting lost here.  Say it one more time.

21         Q.    So you just explained to me that you don't

22   know why the invoice went out in February versus

23   January because you weren't working at the company;

24   is that correct?

25         A.    That's correct.

CONFIDENTIAL

Page 85

1        Q.    But you're also telling me, at the same
2   time, that you know that normal course of business
3   at KnowledgeLake was that the Walmart invoice would
4   not have been paid after it was due on March 16th
5   and before March 31, 2018; is that correct?
6        A.    If you look at the schedule you showed me,
7   okay, these bills are paid in approximately 60 days.
8   They're billed in January, paid in March.  If you
9   take 60 days from February 15th, that puts us into
10  April.
11       Q.    But you also told me earlier you thought
12  it would be paid in June or July.
13       A.    It would have been paid later.  For sure,
14  it would have been paid later.
15       Q.    But you also told me that Walmart would
16  have had to pay their invoices in order to continue
17  having work done by KnowledgeLake for them; is that
18  correct?
19       A.    There had been a history of us collecting
20  services invoices and not starting a new project
21  until they would catch up.  There had been some of
22  that.
23       Q.    And KnowledgeLake's president told you he
24  was trying to collect on the invoice before the
25  close for PFU; is that correct?

CONFIDENTIAL

Page 86

1        A.    That's correct.

2        Q.    And Tsurumi with PFU told you they were

3    trying to collect on the invoice before the close;

4    is that correct?

5        A.    That, I objected to, yes.

6        Q.    How did you object to that?

7        A.    Did you read the e-mail?

8        Q.    I did.   It says to me that you guys

9    renegotiated the deal and PFU is leaving less cash

10   and lowering the purchase price all around what is

11   going on at this time period.

12       A.    But I never agreed that we wouldn't

13   operate the company in its normal and ordinary

14   course of business, which is not using our services

15   people to apply pressure to Walmart, okay, to get

16   bills paid in some extraordinary fashion and having

17   people pay with credit cards.   That's just -- it's

18   totally out of normal course of business.

19            I never agreed, as I said before, to

20   change the SPA, the words in the SPA to make it a

21   free-for-all for collections.

22       Q.    It sounds to me like a "gotcha."   Like you

23   had -- you told me earlier you decided, when this

24   got paid on March 26th, that you had decided you

25   were going to sue PFU?

CONFIDENTIAL

1          A.   I decided --

2          Q.   And PFU is negotiating with you around

3    when it's going to be paid.

4          A.   I decided the damage was done and we would

5    pick it up later --

6          Q.   So you were willing to let PFU charge you

7    less for the company, fully expecting that either

8    you were going to sue on the invoice or it was going

9    to come in and help new KnowledgeLake?

10         A.   At that point, as I mentioned, okay, I had

11   to drop the issue right then to get the deal

12   finished, okay, but it was absolutely not a dead

13   issue.

14              So the fact that they -- it was already --

15   I had already agreed that if it came in, they were

16   going to take it, right?

17         Q.   Right.   But you decided you were going to

18   sue on it?

19         A.   I'm not going to kill the deal over this

20   one issue, right, but it was going to be picked up

21   later because they absolutely breached the contract.

22         Q.   I'm having trouble seeing how there is a

23   breach of contract when you have negotiated with

24   Tsurumi and he has told you that they're trying to

25   collect, and you say, no, that's a showstopper, and

CONFIDENTIAL

1   he comes back and offers you different terms while

2   trying to collect on that invoice.

3       A.    They totally breached the agreement.  They

4   agreed to operate the company in its normal and

5   ordinary course of business, and they clearly did

6   not.

7       Q.    And what's the basis for your statement

8   that this is outside the normal course of business?

9       A.    Asking Gary Wahlig, who's a services

10  person, to look inside the Walmart system; having

11  Bernie, the CEO, make telephone calls to executives

12  at Walmart to apply pressure.

13          Those are things he told me that were

14  happening, and that is not in its normal ordinary

15  course of business.

16      Q.    Well, I think we've walked through what --

17  strike that.

18          I am going to ask you about another

19  e-mail.

20          MS. BAIARDO:  I think we're on Exhibit 5.

21          (Thereupon, the referred-to document was

22  marked for Identification as Defendant's Exhibit 5.)

23  BY MS. BAIARDO:

24      Q.    This is from Bernie to you and your two

25  e-mail addresses and to Robin.  And Bernie says,

CONFIDENTIAL

Page 93

1          Q.    I don't see a date on it.

2                Do you remember if it was -- I believe it

3     was March 31st.

4                Do you recall when you actually signed it?

5          A.    I'm sure the document is dated.  I don't

6     recall.  Sorry.

7          Q.    I think the date is -- it's dated as of

8     March 23rd, but I thought that it had been signed a

9     few days after that.  Let me just check my notes.

10         A.    Why would you think it was signed after

11    that?

12         Q.    I'm trying to recall that.  I can't find

13    my notes about that, but it's dated as of

14    March 23rd.

15                You signed it and Koichi Abe signed it on

16    behalf of PFU.  And then the close occurred on

17    March 31st; is that correct?

18         A.    That's correct.  It would, by the way,

19    make sense that I signed it on the 23rd with Koichi

20    because we were both in St. Louis on the 23rd of

21    March, so ...

22         Q.    So you signed it the 23rd.  The Walmart

23    invoice is paid the 26th.  You mentally set it aside

24    and the closing proceeds -- you decide to continue

25    moving forward and the closing proceeds on March

1    31st.

2            Is that accurate?

3       A.   That's accurate.

4            MS. BAIARDO:  Should we take maybe a five-

5       or ten-minute break?  I just want to collect my

6       notes.

7            THE WITNESS:  Okay.  I can do that.  Thank

8       you, Ali.

9            (Short recess taken.)

10   BY MS. BAIARDO:

11       Q.   Do you know of an old KnowledgeLake

12   customer called Teledyne Brown?

13       A.   I'm familiar, yes.

14       Q.   And did you interact with Teledyne Brown

15   in your role as president, CEO or chairman?

16       A.   In 2006, when the company was very small,

17   I did assist in the sales process of Teledyne Brown,

18   but it's been a long time ago.

19       Q.   Have they -- had Teledyne Brown remained a

20   customer until 2018?

21       A.   Yes.  Until today.

22       Q.   Are you familiar with how old

23   KnowledgeLake would accept payments in general?  Was

24   it just ACH or was it credit card or checks as well?

25       A.    It was always an invoice and companies

CONFIDENTIAL

Page 108

1    Bernie was asked by Gary and then that Gary sent

2    e-mails.

3              Was the invoice overdue when Gary was

4    doing this?

5         A.   The invoice was due on March 15th, and I

6    believe this was around March 21st, I believe.   It

7    was six days overdue.

8              MS. BAIARDO:   Okay.   All right.   Thank

9         you.   Those are all the questions that I have.

10             THE WITNESS:   Thank you.

11             MR. SWIECICKI:   We will waive reading of

12        the transcript.

13             MS. BAIARDO:   Chris and I had talked

14        earlier about the confidentiality of the

15        transcript and the exhibits.   We'll work

16        together on that, but I think, for now, we

17        should just treat the whole thing as

18        confidential, and then we'll work together to

19        figure out what pieces of it would be.

20             THE COURT REPORTER:   Do you need a copy of

21        the transcript?

22             MR. SWIECICKI:   I don't need anything

23        rushed.   Just regular.

24             (Concluded at 1:35 p.m.)

25

CONFIDENTIAL

Page 109

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA    )

3    COUNTY OF BROWARD   )

4

5            I, the undersigned authority, certify that

6    RON CAMERON personally appeared before me and was

7    duly sworn.

8            WITNESS my hand and official seal this

9    28th day of June, 2021.

10                   *Suzanne Vitale*

11           _____

                 SUZANNE VITALE, R.P.R., F.P.R.

12               Notary Public, State of Florida

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 110

1                    CERTIFICATE
2    STATE OF FLORIDA  )
3    COUNTY OF BROWARD )
4              I, SUZANNE VITALE, R.P.R., F.P.R. do
5    hereby certify that I was authorized to and did
6    stenographically report the foregoing deposition of
7    RON CAMERON; that a review of the transcript was not
8    requested; and that the transcript is a true record
9    of my stenographic notes.
10             I FURTHER CERTIFY that I am not a
11   relative, employee, attorney, or counsel of any of
12   the parties, nor am I a relative or employee of any
13   of the parties' attorney or counsel connected with
14   the action, nor am I financially interested in the
15   action.
16
17             Dated this 28th day of June, 2021.
18
19                    *Suzanne Vitale*
20                    _____
                      SUZANNE VITALE, R.P.R., F.P.R.
                      My Commission No. DD179981
21                    Expires: 5/24/2024
22
23
24
25