Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

- - -

KNOWLEDGELAKE, INC.,

a Delaware corporation,

        Plaintiff,    C.A. No.

v.                    20-425 LPS

PFU AMERICA GROUP MANAGEMENT,

INC., a California corporation,

        Defendant.

- - -

June 14, 2021

- - -

       Remote oral deposition of KENJIRO TSURUMI, conducted at the location of the witness in Japan, commencing at 7:00 p.m. Eastern Standard Time, on the above date.

         Magna Legal Services
            866-624-6221
           www.MagnaLS.com

                           Marie Foley
                           RMR, CRR



```
 1
 2   ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:
 3
 4   SWIECICKI & MUSKETT, LLC
 5   BY: CHRISTOPHER S. SWIECICKI, ESQUIRE
 6       16100 Chesterfield Parkway West
 7       Suite 368
 8       Chesterfield, Missouri  63017
 9       636.778.0209
10       Chris@Swiecickilaw.com
11       Representing the Plaintiff
12
13
14   McGUIREWOODS, LLP
15   BY: STEPHEN G. FORESTA, ESQUIRE
16       1251 Avenue of the Americas
17       20th Floor
18       New York New York  10020-1104
19       212.548.2100
20       sforesta@mcguirewoods.com
21       Representing the Defendant
22
23   ALSO PRESENT REMOTELY:
24       Andrew Hodges,  PFU America
25                       in-house counsel
```



```
 1
 2    PFU America, Inc. effective April 1st,
 3    March 17 -- March 2017.
 4        Q.    So that was before the merger?
 5        A.    Yes.
 6        Q.    I mean before the sale.  I'm
 7    sorry about that.
 8        A.    Yes.
 9        Q.    Okay.
10              So, at some time, I would
11    assume, in the fall of 2017, PAI decided
12    to sell KnowledgeLake.
13              Is that correct?
14        A.    That's correct.
15        Q.    If you know, what was the
16    impetus for the sale of KnowledgeLake?
17        A.    That decision was made by PFU
18    Japan.  So, I really don't have a live --
19    a true reason behind why they decided to
20    sell.
21        Q.    Okay.  That's fair enough.
22              So, at some point in the fall of
23    2017, were you notified by somebody that
24    they want to sell KnowledgeLake?
25        A.    Yes.
```


MAGNA LEGAL SERVICES

```
 1
 2     that both sides will honor the terms of
 3     the deal as agreed upon.
 4             And then he asks you to please
 5     confirm that you will honor the current
 6     deal.
 7             Do you see that?
 8       A.    Yeah, I see that.
 9       Q.    Okay.
10             So, in the next conversation at
11     3:18 p.m. on March 21, you reply to
12     Mr. Cameron and said that you were
13     planning on receiving that -- that you
14     anticipated receiving this one million
15     dollars from Wal-Mart when you made the
16     verbal commitment to leave $3 million of
17     cash inside KnowledgeLake at the time of
18     the sale.
19             Is that correct?
20       A.    Yes.
21       Q.    So, is it fair to say that when
22     you were negotiating the stock purchase
23     agreement with Mr. Cameron, that at least
24     internally you were relying upon this one
25     million dollar check from Wal-Mart?  Is
```



Page 47

```
 1
 2    that correct?
 3            MR. FORESTA:   Object to the form
 4       of the question.
 5            You can answer, Kenji.
 6       A.    So, relying on to what extent?
 7            In order to receive -- I mean,
 8    in order to leave $3 million as originally
 9    committed, we thought the -- that accounts
10    receivable Wal-Mart -- from Wal-Mart is
11    critical.  But yet, if there is any other
12    way to resolve the issue, then that's
13    basically what we wanted to derive from
14    discussion with Mr. Cameron back then.
15       Q.    Is it fair to say that during
16    this e-mail chain is the first time you
17    expressed to Mr. Cameron your relying on
18    that one million dollars check?  When I
19    say "you," that KnowledgeLake is relying
20    on that one million dollar check from
21    Wal-Mart to leave the $3 million in
22    KnowledgeLake as per the SPA?
23       A.    Well, yes, but I -- I'm sorry.
24    I couldn't -- I don't know what -- what
25    was your question as to the million
```



Page 50

```
 1
 2      A.    Right.
 3      Q.    Correct?
 4      A.    Mm-hm.
 5      Q.    And in the next paragraph, you
 6  propose some changes --
 7      A.    Right.
 8      Q.    -- to the purchase price.
 9            Can you, kind of, tell me what
10  your proposal was?
11      A.    Instead of a million dollar, we
12  reduce that cash to be remain with the
13  company from $3 million to 2.5 million
14  dollars, which would result in less cash
15  for Mr. Cameron in amount of $500,000.
16  And then also in order to compensate a
17  million dollars difference, we reduce the
18  sales price from 10.7 million dollars to
19  10.2 million dollars, which compensate --
20  so that assuming we don't receive, I mean,
21  Wal-Mart's check, basically Mr. Cameron
22  has nothing to lose.  About the same time,
23  we did ask that if in the event we collect
24  the cash prior to the close of the deal,
25  that cash would be seller's cash so that
```



```
 1
 2      we will distribute the cash to the -- us
 3      prior to the sale.  If not, that was
 4      KnowledgeLake to keep.  That was basically
 5      my offer to Mr. Cameron.
 6          Q.    Thank you.
 7                Directing your attention to the
 8      top of page 3 is the last part of an
 9      e-mail from Ron to you saying that he
10      agrees with PFU leaving 2.5 million in
11      cash.  KnowledgeLake will deliver a 20
12      percent deposit of 2.04 million to PFU on
13      4/2, and then KL will deliver 10.2 in cash
14      to PFU on or before April 20th.
15                Do you see that language?
16          A.    Yes.
17          Q.    In this e-mail response from
18      Ron, and even in your e-mail to Ron at the
19      bottom of page 3, the both of you, perhaps
20      by silence, agreed not to change the term
21      of the SPA regarding the ordinary course
22      of business, correct?
23                MR. FORESTA:  Object to the form
24         of the question.
25                You can answer.
```



```
 1
 2        A.    Yeah, I think that's correct.
 3              MR. SWIECICKI:  We're going to
 4        go to another exhibit here.
 5              (Pause.)
 6              MR. SWIECICKI:  If everybody can
 7        see this next document, it's been
 8        marked as Exhibit 3 for the purpose of
 9        this deposition, but the cover page is
10        Exhibit B.  And just for the record,
11        this is Exhibit B of the Complaint
12        that was filed in the United States
13        District Court in St. Louis when we
14        first initiated the lawsuit.
15              (Exhibit 003, e-mail chain
16        ending March 21, 2018, was marked for
17        identification, as of this date.)
18              MR. SWIECICKI:  Can everybody
19        see that document?
20              MR. FORESTA:  Yes.
21     BY MR. SWIECICKI:
22        Q.    I'm going to direct your
23     attention to page 3 of 7 of the document,
24     at the bottom of the page where it starts
25     "Hi Ron, Regarding your concern."
```



Page 57

```
 1
 2    if Teledyne would like to put their
 3    payment on a credit card.
 4            Is that correct?
 5            MR. FORESTA:  Note my objection.
 6            Kenji, you can answer.
 7            THE WITNESS:  Okay.
 8       A.   So, I'm sorry.  Can you repeat
 9    that question again?
10       Q.   On page 6 it says:  Scott,
11    Please reach out to Kate and see if she
12    would like to put this on the credit card
13    before the end of the month.
14            Do you see that?
15       A.   Yes, I see that.
16       Q.   That e-mail, unless I'm wrong,
17    you tell me what you think of the wording
18    of that e-mail, that e-mail does not sound
19    like Teledyne is asking us if they can put
20    it on a credit card.  We're reaching out
21    to them to see if they would like to put
22    that on a credit card.
23       A.   Well, I'm not really sure, but
24    the -- I can't really speak for them.  All
25    he know is that this e-mail alone.
```



```
 1
 2            But at the very bottom of, I
 3   think, this e-mail, I think Bernie is
 4   asking:  Does Teledyne want to use a
 5   credit card to pay the purchase in March?
 6            And then Scott's response that:
 7   Kate mentioned using a credit card for the
 8   CS Pro Upgrade and Imaging SOW.
 9            That imply that the Teledyne is
10   the one who requested to use a credit card
11   to begin with.  That's how I took it, at
12   least.  And then, I don't know, probably
13   Bernie may be the better person to answer
14   that.
15       Q.   Let me redirect your attention
16   to page 3, the bottom portion, and that's
17   an e-mail from you to Ron in which you
18   said.  Teledyne specifically asked KL for
19   making a payment by credit card, which
20   Bernie approved.
21            What did you rely upon in order
22   to send that response to Ron?
23       A.   My reliance on that the verbal
24   explanation made by Bernie Schweiss.
25       Q.   So he told you that Teledyne
```



Page 75

```
 1
 2    first time.  He may or may not be explicit
 3    statements, but my -- at least my
 4    expectation was that upon acquisition,
 5    Mr. Cameron will be return to be CEO of
 6    the company as a result of Bernie will not
 7    have a position within acquired company.
 8         Q.    So, and this e-mail was on March
 9    21.
10         A.    Yes.
11         Q.    Was there any time between
12    January 1, 2018 and March 31, 2018 that
13    any Fujitsu employee discussed a job for
14    Mr. Schweiss post 3/31/2018?
15         A.    No.  We haven't.  We didn't.
16         Q.    You didn't.
17         A.    All we have is that the -- we
18    have disclosed to him that upon the change
19    of ownership, we had right to terminate
20    his employment at any time.
21         Q.    When you say "he," you're
22    referring to Mr. Schweiss?
23         A.    Yes.
24         Q.    So, I'm going to, kind of,
25    reword what you said.
```



MAGNA
LEGAL SERVICES

Page 78

```
 1
 2      A.    I'm sorry?
 3      Q.    Do you recall about when you
 4  learned that Fujitsu Limited, or one of
 5  its subsidiaries, was in discussion with
 6  employing Bernie post 3/31/18?
 7      A.    Post, that was -- I can't
 8  really -- I'll think that was some time in
 9  summer of 2018 or a little later.
10      Q.    Were you ever made aware that
11  Mr. Schweiss and his wife was invited by
12  Fujitsu to visit Japan?
13      A.    Yes.
14      Q.    When about did you learn of
15  that?
16      A.    When it was -- almost
17  immediately -- probably like a few weeks
18  after that the sale was closed.
19      Q.    And what was your understanding
20  of the purpose of that trip?
21      A.    Well, first of all, that he
22  did -- he completed his duty of the being
23  the president of the company.  Although he
24  knew that his position was no longer
25  available, he worked to terminate the
```



1
2     employees, as requested by the buyer.
3             And more importantly, without
4     ruining the business, he maintain the
5     business running until last date that we
6     transferred the interest in company.
7             Basically, that was for showing
8     that our appreciation of that -- his good
9     work for that, being the president and
10    just running the company.
11    Q.   Did you invite any other
12    executives from KnowledgeLake to Japan for
13    their efforts in completing the sale of
14    the company?
15    A.   No, we haven't.  I haven't.
16    Q.   And why did you not invite
17    others?
18           MR. FORESTA:  Are you asking
19       about Kenji personally or the company?
20           MR. SWIECICKI:  I'm sorry.  No,
21       the company.
22    BY MR. SWIECICKI:
23    Q.   Were other executives of
24    KnowledgeLake invited by Fujitsu to go to
25    Japan after the sale of KnowledgeLake?



Page 81

```
 1
 2    him employment with Fujitsu?
 3        A.    No.
 4        Q.    And I asked a bad question.
 5              Were you not aware, or did you
 6    know that Fujitsu did not discuss
 7    employment for Bernie post sale of
 8    KnowledgeLake?
 9        A.    I'm pretty positive that nobody
10    within the PFU in Japan had discussed with
11    him about potential position for him
12    within our organization.
13        Q.    Do you know when a member of PFU
14    did approach Mr. Schweiss about
15    employment?
16        A.    No.  I mean, none of us have
17    approached him to join -- rejoin us for
18    any type of positions.  He was -- Bernie
19    is the one that approached us about
20    whether there is potential position with
21    us.  That was toward probably -- that was,
22    you know, a few months after the close of
23    the sale.
24        Q.    Were you aware that Mr. Schweiss
25    was first hired by KnowledgeLake in the
```



Page 91

```
 1
 2      A.   Yes, that -- that is because it
 3   is past due invoice.
 4      Q.   Okay.  I'm going to say it
 5   again.
 6           Based upon the language in that
 7   red box and your definition of who "our"
 8   is, somebody from PFU reached out to
 9   Bernie to ensure that the Wal-Mart invoice
10   was to be paid by 3/31/18?
11      A.   Yes.
12      Q.   Okay.  So I'm going to ask you
13   this.
14           Prior from the time you joined
15   this group in April of 2017 when you were
16   with PFU or PAI, did you ever reach out to
17   the president of KnowledgeLake and ask him
18   to collect on a specific invoice?
19      A.   This specific invoice.
20      Q.   No.  My question is this.
21           Prior to March of 2018, did you
22   ever reach out to the president of
23   KnowledgeLake asking him to collect on a
24   specific invoice?
25      A.   Not me personally, but the
```



Page 92

1
2    generally speaking, March 31 is the
3    company's year-end.  We tend to request
4    all the group companies to collect the
5    accounts receivable much as possible.
6        Q.    Do you know who within your
7    group reached out to Bernie regarding the
8    collection of this invoice?
9        A.    This specific request came from
10   me, if I remember correctly.
11       Q.    So, from April 1st of 2017
12   through March 31st of '18, did you ever
13   make such a request to the president of
14   KnowledgeLake?
15             MR. FORESTA:  Such a request
16      being to collect a payment?
17             MR. SWIECICKI:  Yes.
18       A.    Yeah, collect a payment which is
19   we are entitled to receive by the
20   year-end.
21             MR. SWIECICKI:  Let me reword
22      that.
23       Q.    Prior to March of 2018, did you
24   personally ever contact the president of
25   KnowledgeLake and ask him to collect



Page 98

```
 1
 2              A C K N O W L E D G M E N T
 3
 4     STATE OF            )
 5                          :ss
 6     COUNTY OF           )
 7
 8            I, KENJIRO TSURUMI, hereby
 9     certify that I have read the transcript of
10     my testimony taken under oath in my
11     deposition of June 14, 2021; that the
12     transcript is a true and complete record
13     of my testimony, and that the answers on
14     the record as given by me are true and
15     correct.
16
17
18                    _____
                              KENJIRO TSURUMI
19
20     Signed and subscribed to before me this
21     _____ day of _____, 20__.
22
23     _____
24     Notary Public, State of
25
```



Page 100

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK
 4   COUNTY OF NEW YORK
 5
 6          I, Marie Foley, RMR, CRR, a
 7   Certified Realtime Reporter and Notary
 8   Public within and for the State of New
 9   York, do hereby certify:
10          THAT KENJIRO TSURUMI, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by the witness.
15          I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I am
18   in no way interested in the outcome of
19   this matter.
20          IN WITNESS WHEREOF, I have
21   hereunto set my hand this 20th day of
22   June, 2021.
23
24          _____
                 MARIE FOLEY, RMR, CRR
25
```

