## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **KNOWLEDGELAKE, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-425** |
| | : | |
| **PFU AMERICA GROUP** | : | |
| **MANAGEMENT, INC.** | : | |

## MEMORANDUM
## <u>with Findings of Fact & Conclusions of Law</u>

**KEARNEY, J.**                                                    **October 28, 2021**

An experienced businessperson negotiating to buy back the company he once owned and managed may engage in due diligence informing him of his former company's ongoing efforts to collect an overdue receivable from its largest customer. A businessperson knowing the facts then makes a risk/reward bet as to when he thinks the longtime customer will pay. He loses the bet if the customer pays the bill before he owns the company. He wins the bet if the customer pays after. But he cannot both take the risk with the information he has regarding the company's consistent efforts to collect this large receivable and then later sue for breach of covenants or claim fraud when he knows exactly the company is trying to collect before closing consistent with its procedures and the customer then pays before closing. The company did not alter its practices to collect the receivable and did nothing to collect after it agreed to sell to him. But then the customer paid before he could buy back the company. He chose to buy back.  He lost then and again now.

After carefully evaluating the credibility of witnesses and admitted exhibits during our nonjury trial, including the acquiring businessperson's candid admissions as to his risk/reward strategy, we today enter judgment in favor of the Defendant on the Plaintiff's claims but decline to award fees to the Defendant.

# I.      Findings of Fact

1.      Ron Cameron founded KnowledgeLake, Inc. in 1999 as a software company interpreting documents and sorting them electronically in separate files.[1]

2.      He served as KnowledgeLake's Chief Executive Officer from January 2001 to October 1, 2016.[2]

3.      Walmart has been KnowledgeLake's largest customer for over ten years.[3]

4.      Walmart had an annual software maintenance agreement with KnowledgeLake.[4]

5.      Walmart's software maintenance agreement typically renewed February 1 and expired the following January 31 to coincide with its fiscal year.[5]

6.      KnowledgeLake billed Walmart annually for the software maintenance agreement.[6]

7.      KnowledgeLake billed annual recurring invoices thirty to sixty days in advance of the expiration of the previous year for most customers.[7]

8.      KnowledgeLake had a different billing and collection process for Walmart.[8]

9.      KnowledgeLake sent Walmart a quote. Walmart sent KnowledgeLake a purchase order. KnowledgeLake then issued an invoice.[9]

10.      Walmart purchased services and products from KnowledgeLake aside from the annual software maintenance agreement, including application development and Level 2 support, and KnowledgeLake billed Walmart for those services with separate invoices, but at times KnowledgeLake included those services in the annual software maintenance invoice.[10]

11.      KnowledgeLake could call Walmart's "help line" or use online systems such as "retail link" and "Walmart's AP solution system" to check the status of outstanding invoices.[11]

12.     Account Manager Gary Wahlig called Walmart's help line and used the online systems to check on outstanding payments before March 2018 and discussed outstanding invoices with Walmart at meetings before March 2018.[12]

13.     KnowledgeLake billed Walmart for the annual software maintenance agreement with an invoice ending in an "M."[13]

14.     KnowledgeLake billed Walmart four invoices in 2016 ending in "M." KnowledgeLake billed Walmart these invoices on January 12, 13, and 25, 2016. [14]

15.     Walmart paid three of the four invoices before the end of KnowledgeLake's fiscal year – before March 31, 2016.[15]

16.     KnowledgeLake billed Walmart one invoice in 2017 ending in "M" on January 31, 2017. [16]

17.     Walmart paid this invoice before the end of KnowledgeLake's fiscal year – before March 31, 2017.[17]

***Mr. Cameron sells KnowledgeLake to PFU in 2013 and leaves management in 2016.***

18.     Mr. Cameron sold his interest in KnowledgeLake to PFU America Group Management, Inc. in May 2013.[18]

19.     PFU then owned 100% of KnowledgeLake's shares.[19]

20.     PFU retained Mr. Cameron as KnowledgeLake's Chief Executive Officer until October 1, 2016.[20]

21.     Mr. Cameron had no day-to-day role in running KnowledgeLake after October 1, 2016.[21]

22.     Bernard ("Bernie") Schweiss replaced Mr. Cameron as KnowledgeLake's Chief Executive Officer on or about October 1, 2016.[22]

23.     CEO Schweiss remained KnowledgeLake's Chief Executive Officer through the end of March 2018.[23]

24.     CEO Schweiss accepted responsibility "for the overall business of KnowledgeLake, the financial business of KnowledgeLake, and the customer relationship business of KnowledgeLake."[24]

25.     While CEO Schweiss and the executive team did not typically involve themselves in collecting smaller past-due invoices, CEO Schweiss generally understood KnowledgeLake's finances, including collecting large outstanding invoices, because he (in managing KnowledgeLake) had monthly, quarterly, and yearly financial accountability to PFU, and KnowledgeLake wanted "to get everything to present a good financial position at the end of a fiscal period, monthly, quarterly or yearly."[25]

### *CEO Schweiss's procedures with the Walmart account.*

26.     CEO Schweiss continued to require KnowledgeLake's accounting team to bill customers and collect accounts receivable while a "Professional Services" team focused on growing the business with those customers.[26]

27.     KnowledgeLake submitted bills to Walmart through a portal or through the mail.[27]

28.     KnowledgeLake's Jordan Telir and Teresa Pisciotta created invoices, and KnowledgeLake's Dot Vigil collected Walmart's invoices under CEO Schweiss's management in 2018.[28]

29.     KnowledgeLake had a standard procedure for following up on and collecting past due invoices. KnowledgeLake sent the invoice and followed up with the customer in ten to fifteen days to ensure the customer received the invoice and had no issues with it. If KnowledgeLake did

not receive payment in thirty days, it would follow up with the customer and then start the standard collection process involving phone calls and emails.[29]

30.     KnowledgeLake's Accountant Vigil also engaged KnowledgeLake's Professional Services team, including Account Manager Wahlig and Project Manager Marsha Moffet, to follow up with Walmart on outstanding software maintenance and application development invoices.[30]

31.     Account Manager Wahlig, now KnowledgeLake's director of cybersecurity, "devOps" & "IT," served KnowledgeLake as an enterprise architect/technical account manager in March 2018.[31]

32.     Project Manager Moffet served as KnowledgeLake's project manager for Walmart.[32]

***PFU's negotiates to sell KnowledgeLake back to Mr. Cameron while collecting its receivables.***

33.     PFU evaluated selling KnowledgeLake to a different company in late 2017, signed a letter of intent with the company, and proceeded to due diligence with an exclusivity period.[33]

34.     Mr. Cameron wanted to buy KnowledgeLake upon learning of PFU's desire to sell it; his years of experience with PFU informed him PFU did not want to be a defendant in litigation and is generally risk adverse.[34]

35.     Mr. Cameron contacted PFU's Koichi Abe, Kenjiro Tsurumi, and Kiyoshi Hasegawa in late January 2018 to discuss purchasing KnowledgeLake back from PFU.[35]

36.     Mr. Cameron told PFU the deal with the other company is "VERY ONE-SIDED AND VERY RISKY" and would likely result in PFU being sued.[36]

37.     He told PFU to reconsider the sale to the other company: "If you move forward with [the other buyer] the result will be PFU paying them to own [KnowledgeLake] because they

will sue PFU multiple times. As an example, their first lawsuit will be for the loss of the $900k Walmart maintenance renewal which is coming soon. Please reconsider."[37]

38.     At the time Mr. Cameron wrote to PFU about purchasing Knowledgelake, PFU's exclusivity agreement with the other buyer had expired. But PFU had not yet ended discussions with the other buyer.[38]

39.     Mr. Cameron told PFU he could not sign a letter of intent with PFU unless PFU granted him exclusivity in it—meaning PFU could not simultaneously negotiate with another buyer. Mr. Cameron requested PFU end the discussions with the other buyer, and PFU's Tsurumi responded to him: "Understood. [W]e will try to terminate discussions with [the other buyer] after we receive your [letter of intent] and we mutually agree on the terms of the [letter of intent.]" [39]

40.     PFU decided to deal with Mr. Cameron but required KnowledgeLake and him to close the sale before the end of its fiscal year on March 31, 2018.[40]

41.     The parties understood KnowledgeLake's receivables collected before the closing would be PFU's and the money collected after would in the control of Mr. Cameron's ownership, subject to PFU leaving $3 million in cash at the time of closing.[41]

42.     The parties quickly undertook the due diligence process, with KnowledgeLake's Robin Heisler, a member of its accounting department, acting as the point person between PFU and Mr. Cameron.[42]

43.     While PFU and Mr. Cameron continued due diligence and negotiations for the sale of KnowledgeLake, KnowledgeLake continued to collect on its receivables.[43]

44.     KnowledgeLake billed Walmart $1,008,043.22 for its fiscal year 2019 software maintenance contract on February 15, 2018.[44]

45.     KnowledgeLake's invoice set "net 30" payment terms requiring Walmart's payment thirty days from the date of the invoice, or by March 17, 2018.[45]

46.     KnowledgeLake's invoices not paid within payment terms are overdue.[46]

47.     Walmart did not pay the fiscal year 2019 software maintenance invoice by March 17, 2018.[47]

48.     Walmart had other outstanding overdue invoices as of March 17, 2018.[48]

49.     KnowledgeLake's Accountant Vigil "was actively involved in trying to collect the past due Walmart invoices in March 2018," including the outstanding software maintenance invoice.[49]

50.     "In March 2018, Mr. Cameron asked [KnowledgeLake's] Heissler [sic] if [Knowledgelake] was actively collecting the past due invoices and Heissler [sic] told Mr. Cameron that they were."[50]

51.     CEO Schweiss knew of Walmart's past due software maintenance invoice because it was KnowledgeLake's largest invoice of the year and "past due in March."[51]

52.     CEO Schweiss emailed Accountant Vigil on March 16, 2018 to ask if KnowledgeLake received payment for Walmart's fiscal year 2019 software maintenance invoice.[52]

53.     CEO Schweiss first reached out to Accountant Vigil because "the accounting department was responsible for collecting on invoices and posting cash, so they would know when the invoice was paid . . . [and] I would imagine [Dot Vigil] was the one . . . either posting the cash or following up on past due invoices."[53]

54.     Accountant Vigil responded to CEO Schweiss on March 19, 2018 KnowledgeLake had not received payment yet.[54]

55.    CEO Schweiss then inquired when KnowledgeLake billed the invoice, to which Accountant Vigil responded Knowledgelake billed Walmart on February 15.[55]

56.    CEO Schweiss emailed his bosses at PFU, Hiroshi Haruki and Kenjiro Tsurumi, on March 19, 2018, "Walmart's payment should arrive any day, as it was billed net 30 on 2/15."[56]

57.    On March 19, 2018, PFU's Yasuhiro Ogura emailed KnowledgeLake's Accountants Vigil and Heisler regarding KnowledgeLake's cash balance and the status of Walmart's invoice.[57] KnowledgeLake's Heisler described this type of email as "normal practice."[58]

58.    KnowledgeLake's Heisler responded to PFU's Ogura: "Walmart's payment terms are 30 days, there was an invoice issued to them in February for their maintenance renewal."[59] Accountant Vigil then sent a copy of the invoice to PFU's Ogura at his request.[60]

59.    Accountant Vigil reached out to the Walmart Project Manager Moffet in Professional Services by instant message on March 20, 2018 regarding Walmart's past due invoices, including the software maintenance invoice.[61]

Dot Vigil: Hi Marsha[.] Just checking, did you hear from Corey?

Marsha Moffet: I did not hear back from yesterday afternoon. Gary [Wahlig] said the maintenance invoice has been processed through SharePoint and is pending in their BPM system. I don't know when payment will be cut through[.]

Dot Vigil: Ok we still need an answer on the past due invoices. This is critical for fiscal year end. Thanks[.]

60.    CEO Schweiss reached out to Account Manager Wahlig on March 21, 2018 about the status of the fiscal year 2019 software maintenance contract by instant message.[62]

Bernie Schweiss: Gary, Greetings, Do you know how to check the status of the payment by Walmart?

Gary Wahlig: Dot usually calls the Walmart help line[.] GSS scanned and indexed the FY2019 maintenance bundle invoice last week[.] [S]o it should be in BPM to issue payment[.] I'll call the Help Desk this afternoon and see if they can provide an ETA[.]

Bernie Schweiss: THank [*sic*] you very much! Would [*sic*] love to get it in before the end of the month[.]

[29 minutes elapsed]

Gary Wahlig: I called the Walmart help desk. KL should receive a payment of $54,525.00 by 3/25/2018[.] [T]here are no payments scheduled for next week[.] [T]he IVR system disconnects the call when I attempt to speak to a representative[.]

Bernie Schweiss: Interesting, so no payment is scheduled for the maintenance

Gary Wahlig: [S]o I'll email the distribution list and wait for a response since the payment is overdue[.]

Bernie Schweiss: thank you! I appreciate your help. We are trying to get this in before the year end[.]

Gary Wahlig: I'll try to reach out to the VMO contact we've been dealing [with] on the overdue app/dev invoicese [*sic*]

Bernie Schweiss: Let me know if I can help or if you could copy me on the email that would be helpful.

61.     After CEO Schweiss sent Account Manager Wahlig the instant message, Wahlig called Walmart's help desk and learned Walmart had one payment scheduled to issue, but Walmart had not yet scheduled payment for the software maintenance invoice.[63]

62.     Account Manager Wahlig then emailed the Walmart distribution list to inquire about the outstanding, past due invoice on March 21, 2018, with a copy shown to CEO Schweiss.[64]

63.     Account Manager Wahlig attached an invoice to his email. The attached invoice differed from the invoice previously billed to Walmart in February because it contained an additional $25,000 charge for Metalogix StoragePoint upgrade (making the invoice total $1,033,043.22) and had a different format.[65]

9

64.     CEO Schweiss forwarded Account Manager Wahlig's email to PFU's Tsurumi, Ong, and Haruki on the same day to update PFU on KnowledgeLake's largest outstanding invoice of the year.[66]

65.     Account Manager Wahlig also reached out to KnowledgeLake's vendor management office contact regarding the software maintenance invoice.[67]

66.     Account Manager Wahlig also accessed Walmart's portal where it stored invoices through a private view to check the status of the software maintenance invoice. Walmart did not know he had this level of access to its system. Account Manager Wahlig accessed the system every day after March 21 to check the status of the invoice.[68]

67.     CEO Schweiss did not ask Account Manager Wahlig to do any of these things nor did he ask Account Manager Wahlig to direct Walmart to "expedite" the payment by email, but Wahlig thought CEO Schweiss reaching out to him checking on the invoice implied he should.[69]

### Mr. Cameron and PFU continue to negotiate for the sale of KnowledgeLake.

68.     KnowledgeLake's Heisler became aware of Account Manager Wahlig's efforts to collect the past due software maintenance invoice. She forwarded Wahlig's email to her personal email, and then forwarded the email to Mr. Cameron with "FYI" on March 21, 2018.[70]

69.     Mr. Cameron emailed PFU's Tsurumi on March 21, 2018 expressing concern about Account Manager Wahlig's attempts to collect the past due Walmart invoice.[71] He wrote: "Gary Wahlig is NOT an employee of the KL accounting department, and expediting invoices is definitely not part of our agreement. Again, this is NOT in the normal course of KL business."[72]

70.     Mr. Cameron raised concerns about expediting the Walmart receivable as outside of KnowledgeLake's normal course of business before he signed a stock purchase agreement to buy KnowledgeLake back from PFU.[73]

71.     PFU's Tsurumi responded back to Mr. Cameron: "Well, please understand that this Wal-mart [*sic*] invoice is already past due since 3/15. As I wrote in my previous email, we are committed to $3 million based on expectation that Wal-mart [*sic*] will be paying this receivable by the invoice due date. If Gary's email below was requested by Bernie, it was due to our request to Bernie making sure that this invoice is paid prior to the month end. We do not have any intention to expedite payments of clients which are not yet due."[74]

72.     On the same day, in a different email thread, PFU's Tsurumi relayed this same information to Mr. Cameron and requested the stock purchase agreement include language obligating Mr. Cameron to credit PFU back the invoice amount if the Walmart invoice is not paid by March 31, 2018. [75]

73.     Mr. Cameron did not sit idly; he responded to PFU's Tsurumi: "That is NOT acceptable and is a 100% showstopper. My expectation is that both sides honor the terms of the deal as it is currently agreed, and that KL operates in its normal course of business. Please read the draft [stock purchase agreement], it is clear."[76]

74.     PFU's Tsurumi responded the Walmart invoice is already past due, and then proposes new deal terms to account for this invoice issue. He expressly states: "Please note that, if [KnowledgeLake] was successful in collecting the past-due Wal-mart [*sic*] invoice of approximately $1 million during the month of March, we will take the fund[s] at the closing, but, if not, it is yours to keep."[77]

75.     Mr. Cameron accepted this counteroffer on March 22, 2018 to address his concern as to an expedited Walmart payment: "As previously agreed, all receivables (including the $1m Walmart receivable) collected on or before 3/31 will belong to PFU, all receivables collected after 3/31 will belong to [KnowledgeLake]."[78]

76.     Mr. Cameron also informed PFU's Tsurumi he talked to CEO Schweiss "th[at] morning," and he felt he and CEO Schweiss "under[stood] each other" and the deal could move forward.[79]

77.     Mr. Cameron agreed to these terms because he "felt that [KnowledgeLake] had a good chance that [the Walmart software maintenance invoice] would be a bit late . . . [and he had] a good chance of Walmart . . . paying this after 3/31."[80]

78.     Mr. Cameron confirmed in agreeing to these terms he bet Walmart would not pay the invoice before March 31, and he lost the bet.[81]

79.     Mr. Cameron testified he made this bet based on his earlier experience with Walmart not paying on time absent pressure from KnowledgeLake.[82]

80.     Mr. Cameron knew "it [was] important to PFU that this money [from the Walmart software maintenance invoice] come in before the end of the close."[83]

81.     Mr. Cameron planned to "pick[] [the Walmart software maintenance invoice issue] up later" because PFU "absolutely breached the contract," implying he would sue PFU if the Walmart money came in before closing because PFU acted outside the ordinary course of business in his opinion.[84]

### *Mr. Cameron signed the stock purchase agreement.*

82.     Mr. Cameron signed the stock purchase agreement to buy KnowledgeLake back from PFU on March 23, 2018.[85]

83.     PFU represented and warranted on March 23, 2018, "[s]ince December 31, 2017, and prior to the date hereof, [KnowledgeLake] has conducted its businesses only in, and have not engaged in any material transaction other than in accordance with, the ordinary course of businesses consistent with past practice, and there has not been any: (ix)(b) acceleration in the

collection of any accounts or notes receivable or otherwise change on any of its cash management policies . . . other than in the ordinary course of business."[86]

84.     PFU also promised it "shall cause [KnowledgeLake] (i) to conduct its business in the ordinary course and, . . . (ii) not to . . . (q)(ii) accelerate the collection of any accounts or notes receivable or otherwise change any of its cash management policies."[87]

85.     Mr. Cameron and PFU agreed the stock purchase agreement could only be amended or modified in writing with both parties' signatures.[88]

86.     They also agreed the signed stock purchase agreement and a confidentiality agreement "constitute the entire agreement, and supersede all other prior agreements, understandings, representations, and warranties, both written and oral, among the parties with respect the subject matter" in the agreement.[89]

***Walmart pays the outstanding software maintenance invoice on March 26, 2018.***

87.     Walmart paid KnowledgeLake $978,518.22 on March 26, 2018.[90]

88.     KnowledgeLake applied $872,743 to the February 15, 2018 software maintenance invoice and applied the rest to other outstanding invoices.[91]

89.     KnowledgeLake's Heisler later confirmed PFU kept $872,743 of the maintenance invoice and KnowledgeLake kept $135,300 because Walmart paid this amount after closing.[92]

***Mr. Cameron and PFU close the sale.***

90.     PFU closed the sale of KnowledgeLake to Mr. Cameron a week later on March 30, 2018.[93]

91.     Mr. Cameron knew Walmart paid the invoice.[94]

92.     Mr. Cameron knew KnowledgeLake worked with Walmart to obtain payment before closing and he obtained concessions on his terms.[95]

93.     Mr. Cameron knew PFU would get the money paid by Walmart before he closed the sale.[96]

94.     He still closed the sale.[97]

*Mr. Cameron uses KnowledgeLake to sue PFU.*

95.     KnowledgeLake sued PFU for breach of the stock purchase agreement and for intentional misrepresentation.[98]

96.     KnowledgeLake alleged PFU breached Article 4.1 of the stock purchase agreement by accelerating accounts receivables, including the Walmart software maintenance invoice.[99]

97.     KnowledgeLake alleged PFU made intentional misrepresentations in its representations and warranties under Article 3.2(i)(ix)(b) of the stock purchase agreement because it had accelerated accounts receivable but represented and warranted it did not.[100]

## II.     Conclusions of Law[101]

1.     PFU did not breach the stock purchase agreement because PFU and Mr. Cameron signed the stock purchase agreement after the conduct allegedly violating the agreement occurred.

2.     PFU did not breach the stock purchase agreement because KnowledgeLake conducted itself in the ordinary course of business during all relevant times.

3.     KnowledgeLake fails to prove its intentional misrepresentation claim because PFU acted in the ordinary course of business during all relevant times.

4.     KnowledgeLake is not entitled to fees because it did not prevail on the merits.

5.     PFU is not entitled to fees because we do not find KnowledgeLake brought this case or litigated through trial in bad faith.

# III. Analysis

## A.    PFU did not breach the stock purchase agreement.

Mr. Cameron, through KnowledgeLake, alleged PFU breached Article 4.1 of the stock purchase agreement by accelerating payment of the Walmart software maintenance invoice outside of the ordinary course of business.[102] KnowledgeLake now argues in post-trial briefing PFU violated Articles 4.1 *and* 3.1 of the stock purchase agreement by accelerating payment of the Walmart software maintenance invoice outside of the ordinary course of business.[103] PFU did not breach Article 4.1 of the stock purchase agreement because no conduct purportedly breaching the stock purchase agreement occurred after the parties signed the agreement. And even assuming KnowledgeLake pleaded PFU breached Article 3.1 of the stock purchase agreement, PFU did not breach it because it did not act outside of the ordinary course of business.

### 1.    PFU did not breach a non-existent contract.

Mr. Cameron must first show a contract existed at the time the allegedly wrongful conduct occurred.[104] Mr. Cameron, on behalf of KnowledgeLake, signed the stock purchase agreement on March 23, 2018.[105] KnowledgeLake sued for breach of the stock purchase agreement, and Mr. Cameron testified the stock purchase agreement is the only agreement that matters.[106]

Mr. Cameron and PFU agreed: "Except with . . . prior written consent . . . [PFU] shall cause [KnowledgeLake] (i) to conduct its business in the ordinary course . . . (ii) and not to: (q)(ii) accelerate the collection of any accounts or notes receivable or otherwise change any of its cash management policies."[107] In other words, from the date of signing the stock purchase agreement until closing, KnowledgeLake had to conduct its business in the ordinary course, including not accelerating receivables. Mr. Cameron admitted no conduct outside the ordinary course of business occurred on or after March 23, 2018.[108] He admits all conduct occurred *before* he signed the

15

contract he claims PFU breached. PFU did not – and could not have – breached Article 4.1 of the stock purchase agreement because it did not exist when PFU engaged in the conduct it now complaints of.

### 2.      PFU did not act outside of the ordinary course of business.

Even if KnowledgeLake properly pleaded its breach of contract claim as to Article 3.1, PFU did not act outside the ordinary course of business. "Ordinary course" covenants "exist to 'help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing.'"[109] They work to mitigate "the moral hazard problem" – i.e. the incentive for the seller to act opportunistically between signing and closing.[110]

Mr. Cameron and PFU did not define "ordinary course" in the stock purchase agreement. Courts applying Delaware law absent the parties' agreed definition interpret "ordinary course" to mean "the normal and ordinary routine of conducting business."[111] "[T]here are two principal sources of evidence that the court can examine to establish what constitutes the ordinary course of business . . . (i) how similar companies have operated or (ii) how the specific seller company has operated."[112] "[T]he court may look to how the benchmark operated 'both generally and under similar circumstances,'" and "[w]here an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase . . . the court evaluates the second category only."[113]

Courts find certain types of conduct to be outside an ordinary course: fabricating clinical data, canceling audits, and failing to investigate whistle blower complaints; manipulating financial records in deviation of past practice; restructuring a business; and starting a competing business and shuffling assets to it.[114] Mr. Cameron does not offer authority suggesting pursuing receivables is outside a company's ordinary course. He instead relies on an appeal from a bankruptcy court decision where the court considered whether the debtor made payments to a creditor in the ordinary

course of business under the Bankruptcy Code after the bankruptcy trustee challenged the payments as "recoverable preference transfers."[115]

Mr. Cameron (through his control of KnowledgeLake) argues the evidence demonstrates PFU expedited the Walmart receivable outside of the ordinary course of business to its detriment.[116] PFU argues it did not breach the stock purchase agreement because: (1) it did not accelerate a payment because all invoices were past due; (2) it did not operate outside of the ordinary course of business; and (3) if PFU acted outside of the ordinary course, it had Mr. Cameron's written consent to do so.[117] We agree with PFU it did not act outside the ordinary course of business and need not address its remaining arguments.

KnowledgeLake had a standard practice for invoicing and collections. Once the accounting department created and sent the invoice, it would follow up with the customer in ten to fifteen days to make sure the customer received the invoice and to see if the customer had issues with the invoice. If KnowledgeLake did not receive payment within thirty days of the invoice, it would follow up with the customer and start the standard collections process involving phone calls and emails to the customer.[118] KnowledgeLake's Accountant Vigil, the employee responsible for collecting invoices at all times relevant for this lawsuit, engaged the Professional Services team, including Account Manager Wahlig and Project Manager Moffet, to assist in collecting Walmart invoices, both before and during March 2018.[119] The same thing happened with the Walmart software maintenance invoice which Walmart failed to pay on time.

Accountant Vigil actively sought to collect Walmart's past due invoices in March 2018, including engaging Project Manager Moffet to assist.[120] Project Manager Moffet and Account Manager Wahlig had been working to collect the Walmart software maintenance invoice, as well

as other outstanding invoices, on or before March 20, 2018, including inquiring as to its status with KnowledgeLake's vendor management office contact.[121]

Consistent with CEO Schweiss's and PFU's Tsurumi's testimony regarding fiscal year-end financial accountability, Accountant Vigil reported to Project Manager Moffet collecting Walmart's past due invoices "[was] critical for fiscal year end."[122] CEO Schweiss also took an interest in KnowledgeLake's largest invoice of the year and reached out to Accountant Vigil about the status of the invoice on March 16, 2018. After receiving her response, he updated the team at PFU about the status of the invoice.[123]

CEO Schweiss reached out five days later to Account Manager Wahlig – who had then been on KnowledgeLake's Walmart "team" for a decade – by instant message, asking "Do you know how to check the status of the payment by Walmart?"[124] As evidenced by Project Manager Moffet's instant message to Accountant Vigil, Account Manager Wahlig already actively involved himself with the outstanding Walmart software maintenance agreement before CEO Schweiss ever reached out to him.

On his own, without CEO Schweiss saying anything more, Account Manager Wahlig volunteered: (1) he already knew Walmart "scanned and indexed the [fiscal year] 2019 maintenance bundle invoice [last week];" and (2) offered to call the help desk to get an ETA.[125] CEO Schweiss thanked him, and consistent with his responsibility for year-end fiscal accountability, reported "Would love to get it in before the end of the month."[126] Account Manager Wahlig reported back to CEO Schweiss again twenty-nine minutes later. He reported Walmart only had one payment scheduled, not for the software maintenance invoice, and without being asked, Account Manager Wahlig volunteered "I'll email the distribution list and wait for a response since the payment is overdue" and stated he would reach out to the vendor management office

contact as well.[127] CEO Schweiss thanked him, and again said "[w]e are trying to get this in before the year end."[128]

After CEO Schweiss asked him if he knew how to check the status of the payment, Account Manager Wahlig: (1) called the help desk; (2) emailed Walmart's distribution list with an updated invoice asking they "expedite" payment of the past due software maintenance invoice; (3) reached out to Walmart's vendor management office contact; and (4) accessed Walmart's private portal to see if Walmart planned to pay the software maintenance invoice. Account Manager Wahlig admitted CEO Schweiss did not ask him to do any of these things, including to request Walmart "expedite" the payment, but he testified he felt the mere act of CEO Schweiss reaching out implied he should.[129] Account Manager Wahlig also testified no one at PFU spoke to him about the invoice or asked him to request Walmart expedite payment.[130]

CEO Schweiss testified he reached out to Account Manager Wahlig because "it was part of KnowledgeLake's standard procedure for collecting invoices. When accounting was unsuccessful collecting invoices we would reach out to the account manager or the person responsible for the relationship with the account."[131] CEO Schweiss's testimony is corroborated by Accountant Vigil reaching out to Project Manager Moffet on the Professional Services team *before* CEO Schweiss ever contacted Account Manager Wahlig about the Walmart software maintenance invoice, as well as other documentary evidence in the record showing Account Manager Wahlig had been involved in Walmart's past due invoice collection. Other than reaching out to Account Manager Wahlig and asking whether he knew how to check the status of a payment, CEO Schweiss did nothing else to try to collect on this invoice.[132]

KnowledgeLake did not do anything extraordinary to collect the past due invoice payment from Walmart at PFU's direction or behest. KnowledgeLake called and emailed Walmart. That is

it. And KnowledgeLake had no way to make Walmart pay the invoice, other than employing its usual collection procedures, including engaging the account relationship team Project Manager Moffet and Account Manager Wahlig.[133] KnowledgeLake wants us to conclude CEO Schweiss merely asking a question to a Professional Services employee about the company's largest invoice of the year is so out of KnowledgeLake's ordinary course of business to find a breach of the stock purchase agreement. We find no basis to agree.

CEO Schweiss credibly testified about his involvement in the company's finances as CEO. He testified he did not get involved with small invoices, but he did get involved in past due large invoices, including the one here, which he described as KnowledgeLake's largest invoice of the year. He did nothing the accounting department did not already do in its ordinary course when he reached out to Account Manager Wahlig. In fact, Project Manager Moffet had already been in contact with Walmart about the invoice at Accountant Vigil's request. Although not the most persuasive evidence because Walmart's ordinary course of business is not at issue here, Walmart consistently paid the yearly software maintenance invoice *before* KnowledgeLake's fiscal year end. The same thing happened here.

Mr. Cameron's testimony is not as credible as CEO Schweiss given his admission of making a bet on his business strategy. He reached beyond the normal channels and accepted a personal email from KnowledgeLake's employee Heisler detailing its confidential strategies. She offered no credible grounds for her deviation from fiduciary duties of loyalty to her employer. Mr. Cameron though took the information and used it obtain concessions from PFU. He played hardball. But he could not control Walmart. Mr. Cameron appeared during testimony to be a man who decides on a course of action regardless of who or what is in his way. The Law does not bend to Mr. Cameron.

KnowledgeLake acted in the ordinary course of business when it collected Walmart's past due invoices before fiscal year end, including the software maintenance invoice. PFU did not cause KnowledgeLake to act outside of the ordinary course. Because we find KnowledgeLake did not act outside the ordinary course, we need not address PFU's affirmative defenses.

### B.   PFU did not make intentional misrepresentations in the stock purchase agreement.

KnowledgeLake brings a claim for intentional misrepresentation in the stock purchase agreement because PFU represented: "Since December 31, 2017 and, prior to the date hereof, [KnowledgeLake] has conducted its businesses only in . . . the ordinary course of such businesses consistent with past practice, and there has not been any: (ix)(b) acceleration in the collection of any accounts or notes receivable or otherwise change in cash management policies . . . other than in the ordinary course of business."[134] KnowledgeLake contends PFU did not operate KnowledgeLake in the ordinary course because it accelerated payment of Walmart's annual software maintenance invoice. PFU argues KnowledgeLake cannot sustain a claim for intentional misrepresentation because it arises from breach of a contractual duty, and it acted in the ordinary course of business. We need not decide whether the intentional misrepresentation claim can stand because we already determined KnowledgeLake acted in the ordinary course of business. PFU therefore did not make an intentional misrepresentation.

"A claim of intentional misrepresentation requires proof of the following elements: (1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) that the defendant acted with scienter; (3) an intent to induce plaintiff's reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment."[135]

CEO Schweiss and his executive team at KnowledgeLake, at PFU's direction, did not act outside of the ordinary course of business.  PFU did not misrepresent facts in the stock purchase agreement nor did PFU deliberately conceal a material past or present fact to Mr. Cameron. KnowledgeLake, at PFU's direction, acted in the ordinary course of business and the ordinary course representations and warranties were true at the date PFU executed the stock purchase agreement as well as the date of closing.

**C.      Neither party is entitled to fees.**

Mr. Cameron seeks fees under Article 6.2 of the stock purchase agreement. KnowledgeLake does not prevail on the merits and is not entitled to fees under Article 6.2 of the stock purchase agreement because PFU did not breach it nor did PFU make an intentional misrepresentation concerning it. PFU argues it is entitled to fees because KnowledgeLake maintained this action in bad faith after it allegedly knew the lawsuit had no merit. PFU does not argue the stock purchase agreement or other contract entitles it to fees.

PFU concedes Delaware follows the "American Rule" but argues we should award it attorney's fees under the bad faith exception. "[T]he American Rule . . . provides that each party is normally responsible for their own attorneys' fees, whatever the outcome of the litigation, absent express statutory language to the contrary or an equitable doctrine exception, such as the bad faith exception."[136] "Under the American Rule, Delaware courts have awarded attorneys' fees for bad faith when 'parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims.'"[137] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[138] We cannot find Mr. Cameron (putting aside his view of litigation as a bet)

"unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."

Nor can we find Mr. Cameron filed this lawsuit in bad faith. Mr. Cameron admits he is not an attorney but may consider himself a shrewd businessman who thought if he lost his bet Walmart would pay the software maintenance invoice after March 31, he could sue PFU for operating KnowledgeLake outside of the ordinary course of business and he would get the money anyway. Mr. Cameron knew the facts when he made the bet. KnowledgeLake did not act outside of the ordinary course of business during the relevant time period in March 2018, and Walmart paid before March 31 – as Walmart did the previous two years.

While a calculated business move, we have no evidence today Mr. Cameron filed this case or continued litigating the action in bad faith. He thought KnowledgeLake acted outside the ordinary course of business. PFU vigorously disputed his claim.  He presented some evidence from his current employees, all of whom have been promoted post-acquisition to high level roles in his company, about how KnowledgeLake operated outside the usual course during the two-week timeframe in March 2018. PFU credibly contradicted the evidence his employees presented, and his evidence did not carry the day in court.

We can only review the evidence before us. PFU did not adduce evidence at this stage warranting fees against its former company. We express no opinion as to whether PFU may possess other claims against other non-Delaware parties causing it to incur fees here, but those claims do not appear to be within our limited subject matter jurisdiction.

## IV.   Conclusion

Ron Cameron owned and managed KnowledgeLake before selling it to PFU. He remained involved with KnowledgeLake after the sale until October 2016. He later learned PFU wanted to

sell KnowledgeLake, and he decided to acquire it. He engaged in due diligence. He knew, before signing the stock purchase agreement, of the company's continuing efforts with its largest customer Walmart to secure payment of a large past-due receivable before closing and thus retain those revenues for PFU. He knew of this fact and used it to obtain concessions from PFU before signing the stock purchase agreement. He decided to take the risk of suing later. Mr. Cameron adduces no evidence of a breach of contract or misrepresentation based on CEO Schweiss and the executive team seeking to collect its receivable in a manner consistent with their earlier conduct. He did not contract for them to stop working.

Mr. Cameron believed PFU would cower in his game of litigation chicken. He lost his bet. He cost his company attorney's fees. But PFU does not offer evidence his complaint is frivolous or vexatious. We decline to award PFU attorney's fees and costs.

---

[1] D.I. 82-7, Stipulated Facts, ¶ 1–2; D.I. 94, Notes of Testimony (N.T.), Sept. 27, 2021, 99:21–100:2.

[2] D.I. 82-7 ¶ 7.

[3] D.I. 82-7 ¶¶ 11–12.

[4] N.T., Sept. 27, 2021, at 57:23–25, 156:17–157:1.

[5] *Id.*

[6] *Id.* at 31:18–22, 55:14–17.

[7] *Id.* at 36:11–16.

[8] *Id.* at 36:17–19.

[9] *Id.* at 36:18–22, 36:25–37:11.

[10] *Id.* at 54:12–22, 55:22–56:13.

---

[11] *Id.*, at 72:4–19; D.I. 82-7 ¶¶ 16–17.

[12] N.T., Sept. 27, 2021, at 72:4–25, 73:4–11, 74:7–75:20; 78:2–79:16; D.I. 82-7 ¶¶ 16–17; Trial Exs. 48–49.

[13] N.T., Sept. 27, 2021, at 75:21–76:5.

[14] Trial Ex.18.

[15] *Id.*; N.T., Sept. 27, 2021, at 38:20–40:2.

[16] Trial Ex. 18.

[17] *Id*; N.T., Sept. 27, 2021, at 38:20–40:2.

[18] D.I. 82-7 at ¶¶ 3–5; N.T., Sept. 27, 2021, 100:1–9. We note the discrepancy in the transcript of the year Mr. Cameron sold KnowledgeLake to PFU. The testimony reflects Mr. Cameron sold KnowledgeLake in 2013, not 2015. The parties' stipulated facts confirm the same.

[19] D.I. 82-7 ¶ 5.

[20] N.T., Sept. 27, 2021, at 100:10–15, 123:12–16; *see also* D.I. 82-7 ¶ 7.

[21] N.T., Sept. 27, 2021, at 124:5–21.

[22] N.T., Sept. 27, 2021, at 176:5–17.

[23] *Id.* at 176:5–12. In August 2018, Mr. Schweiss began working for Fujitsu Computer Products of America as the Vice President of Sales and Business Development. *Id.* at 175:20–176:1. Fujitsu is a wholly-owned subsidiary of PFU. *Id.* at 179:2–5. Mr. Schweiss did not discuss future employment with PFU prior to the sale of Knowledgelake to Mr. Cameron. *Id.* at 187:21–24. He also did not discuss employment with PFU or Fujitsu during his post-closing trip to Japan at PFU's invite to thank him for serving as CEO through closing. *Id.* at 187:25–10. His first conversations about employment with Fujitsu occurred in June or July 2018. *Id.* at 188:17–21.

[24] *Id.* at 176:18–22.

[25] N.T., Sept. 27, 2021, at 177:9–180:12; *see also* Tsurumi Dep. Desig., June 14, 2021, at 91:20–92:5.

[26] N.T., Sept. 27, 2021, at 11:13–12:10. The Professional Services team "is a department within KnowledgeLake responsible for projects with customers." N.T., Sept. 27, 2021, at 53:14–21.

[27] D.I. 82-7 ¶ 13.

---

[28] *Id.*; N.T., Sept. 27, 2021, at 12:17–13:6.

[29] N.T., Sept. 27, 2021, at 13:7–24; D.I. 82-7 ¶ 19.

[30] Trial Exs. 1, 34, 36, 37, 48, 49; N.T., Sept. 27, 2021, at 74:7–75:20, 89:24–90:10. In March 2018, Account Manager Wahlig had been on the Walmart account for ten years. N.T., Sept. 27, 2021, at 52:24–53:1.

[31] N.T., Sept. 27, 2021, at 51:4–14.

[32] *Id.* at 78:21–23.

[33] *Id.* at 15:13–25, 17:1–5.

[34] *Id.* at 152:1–7, 152:17–153:1.

[35] Trial Ex. 3.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] N.T., Sept. 27, 2021, at 104:17–23.

[41] *See, e.g.* Trial Ex. 14 (Tsurumi discussing amount of money to be left by PFU at close of sale, and Cameron indicating "*as previously agreed*, all receivables (including the $1m Walmart receivable) collected on or before 3/31 will belong to PFU, all receivables collected after 3/31 will belong to [KnowledgeLake]") (emphasis added).

[42] N.T., Sept. 27, 2021, at 17:6–18:2, 106:3–10. Following the re-acquisition of KnowledgeLake, Robin Heisler remained employed by Mr. Cameron, and she became Chief Financial Officer and then Vice President of Finance and Operations. N.T., Sept. 27, 2021, at 11:13–15; Trial Ex. 18 (email signature indicating title as "CFO").

[43] D.I. 82-7 ¶ 20.

[44] Trial Ex. 4; *see also* Trial Ex. 5 (Vigil informing Schweiss KnowledgeLake billed Walmart on February 15, 2018 ); Trial Ex. 6 (Robin Heisler informing Yashuro Ogura KnowledgeLake billed Walmart the maintenance renewal invoice in February 2018); N.T., Sept. 27, 2021, at 35:1–21 (Heisler testifying regarding invoice), 180:18–181:10, 191:6–194:8 (Schweiss discussing invoice and change in previous testimony regarding accounting submitting invoice to Walmart).

---

[45] Trial Ex. 4; N.T., Sept. 27, 2021, at 35:6–14, 18–21.

[46] N.T., Sept. 27, 2021, at 35:15–17.

[47] Trial Ex. 5 (email from Accountant Vigil to CEO Schweiss on March 19, 2018 indicating invoice past due).

[48] N.T., Sept. 27, 2021, at 20:7–12, 30:24–31:4.

[49] D.I. 82–7 ¶ 22; N.T., Sept. 27, 2021, at 35:18–36:10, 92:8–93:6; Trial Ex. 36.

[50] D.I. 82-7 ¶ 23. The parties misspelled Robin Heisler's name in their stipulated facts.

[51] N.T., Sept. 27, 2021, at 180:23–181:3.

[52] Trial Ex. 5; N.T., Sept. 27, 2021, at 182:1–183:14.

[53] N.T., Sept. 27, 2021, at 182:21–183:3.

[54] Trial Ex. 5.

[55] *Id.*; *see also* N.T., Sept. 27, 2021, at 183:4–14.

[56] Trial Ex. 5.

[57] Trial Ex. 7.

[58] N.T., Sept. 17, 2021, at 21:6–16.

[59] Trial Ex. 7.

[60] *Id.*

[61] Trial Ex. 31; N.T., Sept. 27, 2021, at 93:17–22. At trial, Account Manager Wahlig testified Corey Green "was the assigned [Vendor Management Office] contact to KnowledgeLake." N.T., Sept. 27, 2021, at 62:23–63:1; 78:15–18.

[62] Trial Ex. 10.

[63] N.T., Sept. 27, 2021, at 61:4–25, 66:10–67:10.

[64] *Id.* at 62:10–19. Account Manager Wahlig testified he had not done this before. *Id.* at 62:20–22. *See also* Trial Ex. 8 (Wahlig email to Walmart distribution list and CEO Schweiss forwarding email to employees at PFU).

---

[65] Trial Ex. 8; N.T., Sept. 27, 2021, at 65:25–69:12, 85:23–86:10.

[66] Trial Ex. 8.

[67] N.T., Sept. 27, 2021, at 63:6–8.

[68] *Id.* at 63:13–65:17.

[69] *Id.* at 87:10–88:25, 91:3–17, 92:1–7.

[70] *Id.* at 138:25–139:23, 159:25–161:4.

[71] Trial Ex. 9 (PFU_00002744).

[72] *Id.* Despite Mr. Cameron's assertions now regarding what he believed to be KnowledgeLake's normal course of business, he admitted he had no involvement in KnowledgeLake's business practices after stepping down as CEO on October 1, 2016. N.T., Sept. 27, 2021, at 124:5–21.

[73] Trial Ex. 9; *see also* Trial Ex. 26 (stock purchase agreement signed on March 23, 2018).

[74] Trial Ex. 9.

[75] Trial Ex. 14.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] N.T., Sept. 27, 2021, at 130:22–131:10.

[81] *Id.* at 131:12–23.

[82] *Id.*, at 135:1–137:9.

[83] *Id.* at 148:16–21; D.I. 82-7 ¶¶ 25–28.

[84] N.T., Sept. 27, 2021, at 147:15–23; 150:9–151:25. While Mr. Cameron testified he decided to sue in October 2018 because Walmart canceled the software maintenance contract, we do not credit this testimony. Mr. Cameron told PFU – in a bid for PFU to end purchase negotiations with the previous buyer – Walmart was going to cancel the software maintenance contract months before October 2018. *Id.* at 156:7–14; Trial Ex. 3 (Cameron email to PFU stating buyer would sue

PFU multiple times, "[a]s an example, their first lawsuit will be for the loss of the $900k Walmart maintenance renewal which is coming soon.").

[85] *Id.* at 154:15–16.

[86] Trial Ex. 26, Art. 3.1(i)(ix)(b).

[87] *Id.,* Art. 4.1(q)(ii).

[88] *Id.*, Art. 8.1.

[89] *Id.*, Art. 8.5.

[90] Trial Ex. 30; *see also* N.T., Sept. 27, 2021, at 20:7–21:3, 137:10–14; D.I. 82-7 ¶ 30.

[91] N.T., Sept. 27, 2021, at 40:3–41:7.

[92] Trial Ex. 18.

[93] D.I. 82-7 ¶ 31.

[94] *Id.* ¶ 30.

[95] *See, e.g.* Trial Ex. 14.

[96] D.I. 82-7 ¶ 29; *see also* Trial Ex. 14.

[97] D.I. 82-7 ¶¶ 30–31.

[98] D.I. 1.

[99] *Id.*, ¶¶ 6–12(a).

[100] *Id.* ¶¶ 15–21.

[101] The parties agreed Delaware law applies to any cause of action arising from or related to the stock purchase agreement. Trial Ex. 26, Art. 8.3.

[102] D.I. 1. KnowledgeLake never filed an amended complaint.

[103] D.I. 95 at 12–15.

[104] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (discussing elements of breach of contract, including "existence of the contract," breach of the obligation, and damages).

---

[105] N.T., Sept. 27, 2021, at 154:15–16; *see also* Trial Ex. 26.

[106] D.I. 1; N.T., Sept. 27, 2021, at 120:16–23. We note the transcript incorrectly states Mr. Cameron testified "the written SPA is the only document that *can't* matter." This is incorrect. Mr. Cameron testified "the written SPA is the only document that *can* matter." We sought clarification after Mr. Cameron made this statement. The context of the testimony further confirms Mr. Cameron testified the SPA is the only document that *can* matter, not *can't*.

[107] Trial Ex. 26, Art. 4.1(q)(ii).

[108] N.T., Sept. 27, 2021, at 141:5–24.

[109] *Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021) (quoting *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *83 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018)).

[110] *Id.* (citing *Akorn, Inc.*, 2018 WL 4719347, at *83, n.775, *88).

[111] *Id.* (further citations omitted); *see also AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *68 (Del. Ch. Nov. 30, 2020) ("The court thus treated the ordinary course of business as the customary and normal routine of managing a business in the expected manner" and finding conduct outside of the ordinary course when it "departed radically from the normal and routine operation" and "[was] wholly inconsistent with past practice"); *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009) (relying on Black's Law Dictionary to define ordinary course).

[112] *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *38 (citing *AB Stable*, 2020 WL 7024929, at *70).

[113] *Id.* (further citations omitted). Here, the parties only presented evidence of Knowledgelake's ordinary course of business.

[114] *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *11 (Del. Ch. June 11, 2020), *reargument granted*, 2020 WL 4249874 (Del. Ch. July 24, 2020) (collecting cases wherein companies were found to have acted outside the ordinary course of business).

[115] *In re: AE Liquidation, Inc.*, 2015 WL 5301553, at *1–3 (D. Del. Sept. 10, 2015).

[116] D.I. 95, 98.

[117] D.I. 96–97.

[118] N.T., Sept. 27, 2021, at 13:7–24; D.I. 82-7 ¶ 19.

[119] Trial Exs. 1, 34, 36, 37, 48, 49; N.T., Sept. 27, 2021, at 74:7–75:20, 89:24–90:10.

[120] D.I. 82-7 ¶ 23; Trial Ex. 31.

[121] Trial Ex. 31 (demonstrating Moffet reached out to the vendor management office contact on March 19, 2018 about past due invoices).

[122] *Id.*; N.T., Sept. 27, 2021, at 177:9–180:12; Tsurumi Dep. Desig., June 14, 2021, at 91:20–92:5.

[123] Trial Ex. 5; N.T., Sept. 27, 2021, at 182:1–183:14.

[124] Trial Ex. 10.

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] N.T., Sept. 27, 2021, at 61:4–25, 62:10–19, 63:6–8, 63:13–65:17, 66:10–67:10, 70:7–13, 87:10–88:25, 91:3–17, 92:1–7.

[130] *Id.* at 86:20–22, 92:1–2.

[131] N.T., Sept. 27, 2021, at 183:15–23.

[132] *Id.* at 184:24–185:19. Mr. Cameron makes much to do about an email from PFU in Japanese, which has been translated to mean: "We confirmed that $1.0M (which was reported to be 'delayed' last week) was deposited from Walmart on 3/26 (US time). This is thanks to the efforts of KL President Bernie negotiating with Walmart and requesting an electronic transfer." KnowledgeLake offers no testimony from its sender as to what he or she meant, and Mr. Schweiss credibly refuted he negotiated with Walmart or even spoke to Walmart about the invoice.

[133] *Id.* at 185:16–19.

[134] Trial Ex. 26, Art. 3.1(i)(ix)(b).

[135] *Kane v. NVR, Inc.*, 2020 WL 3027239, at *4 (Del. Ch. June 5, 2020) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

[136] *Tack v. Lipetz Tr. of Mary Meade Lipetz Revocable Tr. Dated Dec. 6, 2007*, 2021 WL 4595660, at *5 (Del. Ch. Oct. 6, 2021) (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989)).

[137] *Id.* (citing *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005)).

[138] *Id.* (quoting *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).